972 A.2d 462 (2009)
407 N.J. Super. 619
In the Matter of the CIVIL COMMITMENT OF W.X.C., SVP-458-07.
DOCKET NO. A-0347-07T2.
Superior Court of New Jersey, Appellate Division.
Submitted April 29, 2009.
Decided June 19, 2009.
*464 Ronald K. Chen, Public Advocate, attorney for appellant W.X.C. (Alison Perrone, Designated Counsel, on the brief).
Anne Milgram, Attorney General, attorney for respondent State of New Jersey (Lewis A. Scheindlin, Assistant Attorney General, of counsel; Lisa Marie Albano, Deputy Attorney General, on the brief).
Before Judges STERN, LYONS and ESPINOSA.
The opinion of the court was delivered by
LYONS, J.A.D.
W.X.C. appeals from a judgment committing him to the Special Treatment Unit (STU) pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We affirm. The following factual and procedural history is relevant to our consideration of the issues presented on appeal.
The crimes that led to W.X.C.'s present commitment all took place in 1992 when W.X.C. was twenty-five years old. W.X.C. burglarized his first victim's home twice when she was not in the house. On April 17, 1992, W.X.C. entered the home for a third time and, at knifepoint, raped the victim, a young woman. After committing the assault, W.X.C. demanded money and, when the victim had none, stole her VCR. According to various psychological reports, W.X.C. found it sexually exciting to be in the victim's home during the first two burglaries, even while she was not there.
On June 4, 1992, W.X.C. entered another home, this time using a key he had found outside, and raped a woman after telling her he had a gun. W.X.C. then made her drive him to an ATM machine, where he forced her to withdraw and give him approximately $600. He also stole two of the victim's rings. On October 22, 1992, W.X.C. entered a rest home and overpowered a female employee. He dragged her into an empty bedroom and *465 demanded that she perform an oral sex act on him. The police were called and W.X.C. attempted to flee but was apprehended.
In his statement to the police, W.X.C. admitted to committing all three assaults. On October 5, 1993, pursuant to a negotiated agreement, W.X.C. pled guilty to two counts of first degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), first degree kidnapping, N.J.S.A. 2C:13-1(b), and two counts of first degree armed robbery, N.J.S.A. 2C:15-1. The plea agreement called for various consecutive and concurrent sentences, aggregating twenty-four years imprisonment, with a twelve-year period of parole ineligibility.
Prior to his sentencing, Dr. Mark Frank, a clinical psychologist, evaluated W.X.C. to determine if he should be committed to the Adult Diagnostic and Treatment Center (ADTC) for sex offender treatment, pursuant to N.J.S.A. 2C:47-1 to -8; R. 3:21-3. Dr. Frank determined that "the `taking' of sex by [W.X.C.] has no more meaning for him than the taking of money or property." Based on this finding, Dr. Frank determined that W.X.C.'s criminal sexual behavior was not compulsive and he was therefore not a viable candidate for sex offender treatment pursuant to N.J.S.A. 2C:47-1. Dr. Frank also noted that W.X.C. had a history of drug and alcohol abuse and recommended that he receive psychotherapy and attend drug and alcohol treatment programs.
The trial judge sentenced W.X.C. on April 4, 1994. W.X.C. requested that the court consider that he had admitted to committing the subject offenses, that he was remorseful, and that he himself was sexually abused as a child. After finding no mitigating factors applied, the judge sentenced W.X.C. to twelve years of imprisonment for his kidnapping charge, with a six-year period of parole ineligibility, to run consecutively with a twelve-year term, with a six-year period of parole ineligibility for the two counts of aggravated sexual assault and the two counts of armed robbery. W.X.C. subsequently filed a pro se motion to amend the sentence, arguing that the judge erred in not finding W.X.C.'s own history of sexual abuse as a child to be a mitigating factor. The trial judge denied his motion. W.X.C. later admitted, during subsequent evaluations, that he was not abused as a child but lied in the hope that his sentence would be reduced.
W.X.C.'s criminal record prior to the subject sexual assaults revealed seven adjudications of delinquency as a juvenile, which included assault, burglary, and possession of a controlled dangerous substance. As an adult, his convictions included obstructing police and assault.
On April 23, 2007, prior to W.X.C.'s scheduled release from prison, the State filed a petition to civilly commit him under the SVPA. W.X.C. filed a motion arguing that the SVPA is punitive because he was not afforded sex offender treatment during the period of his incarceration and, therefore, the statute is unconstitutional.
The SVPA trial judge held a commitment hearing on July 23 and 25, 2007. She began by denying W.X.C.'s motion, rejecting his argument that the SVPA was unconstitutional on its face. The judge reserved ruling on whether the statute was unconstitutional as applied, pursuant to W.X.C.'s argument that he should have been provided with sex offender treatment while he was serving his sentence.
At the civil commitment hearing, the State produced two expert witnesses, Dr. Brian Friedman and Dr. Evan Feibusch. No other witnesses testified.
Dr. Friedman testified that in rendering his opinion, he reviewed "all of the police *466 documents, investigation reports, presentence reports, Judgments of Conviction, [and] victim statements." He also examined W.X.C.'s statement to police, his prison records, and "reports completed over the years by different evaluators...." When questioned about his reliance on reports by other mental health professionals, Dr. Friedman explained: "I utilize them just to get a little bit of kind of a snapshot of how an individual presented at varying points in the past.... However, ... I went through all the original documents myself." He also noted "I do not rely on other professionals' diagnoses or opinions regarding risk. I formulate my own conclusions." Dr. Friedman attempted to interview W.X.C., but he refused. W.X.C. likewise refused to participate in any psychological testing.
Dr. Friedman testified that W.X.C. tended to pair sexual arousal and violence, compulsively masturbated to movie scenes depicting rape or death, and committed the rapes despite having an acceptable consenting sexual partner. Also of note was the fact that W.X.C.'s first two rapes were planned, while his third attack was spontaneous, perhaps showing a decreasing ability to control himself. Dr. Friedman opined that W.X.C.'s reduced inhibitions from drug and alcohol abuse may also increase his risk to re-offend.
In terms of W.X.C.'s personality traits, Dr. Friedman expressed concern that W.X.C. did not appear to have any genuine empathy for his victims and consistently used manipulation to avoid or reduce punishment. For example, W.X.C. created a fictional history of child abuse in an attempt to have his sentence reduced. Dr. Friedman also referred to various reports from other evaluators who noted that W.X.C.'s requests for treatment of any kind seemed insincere and geared towards avoiding responsibility for his actions. For example, W.X.C. admitted that he only attended substance abuse treatment programs "to get some help in sentencing" and "not because he actually wanted to change his behavior." Generally, Dr. Friedman found that W.X.C. was deceitful, lacked remorse for his behavior, was impulsive, and had poor behavioral controls.
Dr. Friedman diagnosed W.X.C. with antisocial personality disorder, which is a risk factor for recidivism. He also diagnosed him with paraphilia, NOS (non-consenting), meaning that W.X.C. has experienced recurrent and intense fantasies, urges, and behaviors involving non-consensual sexual acts for at least six months. Based on these findings, Dr. Friedman opined that W.X.C. "is highly likely to engage in future acts of deviant sexual behavior as defined by the SVP statute if released into the community at this time."
W.X.C. also declined to be interviewed by Dr. Feibusch. As a result, Dr. Feibusch based his opinion on various psychological reports prepared on prior occasions, police reports, and clinical risk assessment tests. He testified that in reviewing that information he was "mostly looking for things that the evaluatee may have said to the person who is doing the evaluating that's helpful...." He noted "[t]he opinions that are in other evaluators' reports can stimulate my thinking in certain directions, but the opinion contained in my report is my own."
Dr. Feibusch began by calling attention to the fact that W.X.C. had "sexualized" breaking into his first victim's home. He also noted that W.X.C.'s assaults had elements of playing out sexual fantasies and observed that the rapes appeared planned and were not committed "in the context of a burglary." Dr. Feibusch also found it significant that W.X.C. was aroused by viewing movie scenes of women who had *467 been murdered. Like Dr. Friedman, Dr. Feibusch noted W.X.C.'s propensity to manipulate and discussed his attempts to gain sympathy from the sentencing judge by untruthfully stating he was a sexual abuse victim himself. Dr. Feibusch also utilized the Static-99 test, a "well validated actuarial instrument designed to estimate the probability of sexual and violent recidivism among adult males who have been charged with at least one sexual offense." W.X.C. scored a six on this test, placing him in the "high risk" category to re-offend. Based on these considerations, Dr. Feibusch diagnosed W.X.C. with antisocial personality disorder, paraphilia NOS, and possibly sexual sadism and opined that it was "highly likely" that he would re-offend if he was not confined to an institution for treatment.
The trial judge rendered an oral decision on August 20, 2007, finding that W.X.C. remained a sexually violent predator in need of commitment. At that time, the judge denied the portion of W.X.C.'s motion that argued the SVPA was unconstitutional as applied because he had not been afforded sex offender treatment while serving his sentence. The judge quoted In re Civil Commitment of E.S.T., 371 N.J.Super. 562, 565 n. 1, 854 A.2d 936 (App.Div.2004), where we stated that "even a finding by the ADTC that a defendant is not eligible for sex offender sentencing does not preclude a later civil commitment of that defendant under the SVPA."
In reviewing the testimony of Dr. Friedman, the judge found "[r]espondent has demonstrated the characteristics of the antisocial personality disorder, including his lack of remorse, his manipulativeness, his demonstration of feeling that rules do not apply to him, his lack of regard for the rights of others, and his taking what he wants when he wants it." She further held that "[t]he respondent has demonstrated his difficulty controlling his sexually violent behavior and he is highly likely according to the testimony to recidivate." The trial judge likewise accepted Dr. Feibusch's diagnosis of paraphilia and antisocial personality disorder.
The trial judge found:
[t]he diagnoses of Dr. Friedman and Dr. Feibusch are not contradicted. The basis for the diagnoses were clearly stated by both witnesses based on materials which are clearly presented in the record and particularly in the statements of the respondent himself. The State's evidence was clear and convincing. The Court is clearly convinced that the respondent is a sexually violent predator.
The judge ordered that W.X.C. be reevaluated after one year. This appeal ensued.
On appeal, W.X.C. presents the following arguments for our consideration:
POINT I
THE CIVIL COMMITMENT OF W.X.C. WITHOUT ANY PRIOR OPPORTUNITY FOR SEX OFFENDER TREATMENT WAS PUNITIVE AND THEREFORE IN VIOLATION OF THE CONSTITUTIONAL GUARANTEES AGAINST EX POST FACTO LAWS.
POINT II
THE STATE FAILED TO PROVE BY COMPETENT, CLEAR AND CONVINCING EVIDENCE THAT W.X.C. WAS SUBJECT TO SVP COMMITMENT.
POINT III
THE COURT ERRED IN RELYING ON THE OPINIONS OF DRS. FRIEDMAN AND FEIBUSCH BECAUSE THESE OPINIONS WERE BASED IN PART ON THE OPINIONS OF NON-TESTIFYING EXPERTS. (NOT RAISED BELOW).

*468 POINT IV

THE EVALUATIONS PREPARED BY NON-TESTIFYING EXPERTS CONSTITUTE HEARSAY, DO NOT COMPLY WITH N.J.R.E. 703, AND SHOULD NOT HAVE BEEN ADMITTED AS EXHIBITS AT TRIAL. (NOT RAISED BELOW).
Our scope of review of civil commitment judgments is exceedingly narrow. In re Civil Commitment of J.M.B., 395 N.J.Super. 69, 89, 928 A.2d 102 (App.Div. 2007), aff'd, 197 N.J. 563, 964 A.2d 752 (2009); In re Civil Commitment of V.A., 357 N.J.Super. 55, 63, 813 A.2d 1252 (App. Div.), certif. denied, 177 N.J. 490, 828 A.2d 917 (2003). We must give the "utmost deference" to the reviewing judge's determination of the appropriate balancing of societal interest and individual liberty. In re Commitment of J.P., 339 N.J.Super. 443, 459, 772 A.2d 54 (App.Div.2001) (citing State v. Fields, 77 N.J. 282, 311, 390 A.2d 574 (1978)). That determination will be subject to modification on appeal only where the record reveals a clear abuse of discretion. J.M.B., supra, 395 N.J.Super. at 90, 928 A.2d 102. Accordingly, it is our responsibility to canvass the record, inclusive of the expert testimony, to determine whether the findings made by the trial judge were clearly erroneous. In re D.C., 146 N.J. 31, 58-59, 679 A.2d 634 (1996).
We begin by addressing W.X.C.'s contention that the State failed to prove by clear and convincing evidence that he is a sexually violent predator. To be deemed a sexually violent predator under the SVPA, the individual must have been convicted, adjudicated delinquent, or found not guilty by reason of insanity, of a "sexually violent offense" or declared incompetent to stand trial for such an offense. N.J.S.A. 30:4-27.26. The statutory definition of a "sexually violent offense" is contained in N.J.S.A. 30:4-27.26(a) and (b). Subsection (a) lists the following offenses: aggravated sexual assault; sexual assault; aggravated criminal sexual contact; sexual contact; certain forms of kidnapping and felony murders; attempts to commit those enumerated acts; and all criminal offenses with substantially the same elements as those offenses. N.J.S.A. 30:4-27.26(a). Subsection (b) is a catchall provision to include "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." N.J.S.A. 30:4-27.26(b). It does not matter when the offense was committed as long as it qualifies as a predicate offense under the SVPA. J.M.B., supra, 395 N.J.Super. at 75, 928 A.2d 102.
In addition to the determination that a person committed a sexually violent offense, the State must prove that the person is a threat to the health and safety of others because he or she "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. Our Supreme Court has interpreted the statute to require the State to establish by clear and convincing evidence that it is "highly likely" the person will re-offend in the reasonably foreseeable future. In re Commitment of W.Z., 173 N.J. 109, 120, 801 A.2d 205 (2002).
The State put forth proof as to several incidents leading to convictions that are sexually violent offenses under N.J.S.A. 30:4-27.26(a). W.X.C. sexually assaulted three different women in the span of approximately six months. He pled guilty to those offenses and was convicted of aggravated sexual assault, sexual assault, and kidnapping. These offenses are all specifically enumerated under N.J.S.A. 30:4-27.26(a) *469 as "sexually violent." The trial judge, therefore, clearly did not err in finding that the first prong of N.J.S.A. 30:4-27.26 had been satisfied.
The trial judge also found that W.X.C. is a threat to the safety of others because he suffers from a mental abnormality or personality disorder that makes him likely to engage in acts of sexual violence. N.J.S.A. 30:4-27.26. Both Drs. Friedman and Feibusch opined that W.X.C. suffers from paraphilia and antisocial personality disorder and these conditions can manifest themselves through acts of sexual violence. Dr. Feibusch testified that W.X.C. scored a six on the Static-99 risk assessment test, putting him at a high risk to re-offend. Both doctors also noted that W.X.C.'s drug and alcohol addiction may lead to reduced inhibitions, thus exacerbating his propensity to commit sexual assault. Drs. Friedman and Feibusch based these opinions on W.X.C.'s criminal history as well as numerous documents in the record, including police documents, investigation reports, presentence reports, judgments of conviction, victim statements, as well as psychological reports. W.X.C. did not contradict these doctors' diagnoses.
Based on the doctors' thorough testimony and reports, the trial judge found that W.X.C. did in fact suffer from personality disorders that make him likely to engage in acts of sexual violence. She also determined by clear and convincing evidence that W.X.C. was at risk to re-offend unless he is confined to an institution for treatment. Because this finding is amply supported by the record, the trial judge did not abuse her discretion in determining that W.X.C. is a sexually violent predator.
We next turn to W.X.C.'s argument that his civil commitment is punitive and therefore in violation of the ex post facto clauses of the State and Federal Constitutions. W.X.C. asserts that because the State did not offer him sex offender treatment during his incarceration, and instead waited until he had served his sentence before committing him to a treatment facility, his commitment is further punishment for his offenses and therefore prohibited by the ex post facto clause.
Both the United States and New Jersey Constitutions forbid the Legislature from passing ex post facto laws. U.S. Const. art. I, § 9, cl. 3; U.S. Const. art. I, § 10, cl. 1; N.J. Const. art. IV, § 7, P 3; State v. Fortin, 198 N.J. 619, 626-27, 969 A.2d 1133 (2009). In order to violate the ex post facto clause, the statute in question must (1) punish as a crime an act previously committed, which was innocent when done; (2) make more burdensome the punishment for a crime after its commission; or (3) deprive a defendant of any defense available according to the law at the time when the crime was committed. State v. Muhammad, 145 N.J. 23, 56, 678 A.2d 164 (1996). Here, W.X.C. argues that his civil commitment is a "more burdensome" punishment for his crimes.
Our Supreme Court has already addressed whether the SVPA violates the ex post facto clause and has held that it does not. J.M.B., supra, 197 N.J. at 601, 964 A.2d 752; In re Civil Commitment of J.H.M., 367 N.J.Super. 599, 608, 845 A.2d 139 (App.Div.2003), certif. denied, 179 N.J. 312, 845 A.2d 137 (2004). The SVPA is not a criminal statute but rather a civil commitment statute with one of its primary objectives being the treatment of the sex offender. J.H.M., supra, 367 N.J.Super. at 608, 845 A.2d 139. Involuntary commitment under the SVPA "is not punitive but a consequence of a reasoned balance between the liberty interest of a committee in need of treatment for emotional disorders and protection of the citizenry from those who have demonstrated an inability *470 to control their sexual violent behavior and are highly likely to re-offend." In re Civil Commitment of J.M.B., 395 N.J.Super. 69, 97, 928 A.2d 102 (App.Div.2007), aff'd, J.M.B., supra, 197 N.J. 563, 964 A.2d 752.
"[T]he Constitution does not prevent society from attempting to protect itself from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably designed for that purpose and only for that purpose, and not designed to punish...." Doe v. Poritz, 142 N.J. 1, 12, 662 A.2d 367 (1995). Far from any punitive objective, the SVPA's confinement is instead linked to the stated purposes of the commitment, "namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." J.H.M., supra, 367 N.J.Super. at 610-11, 845 A.2d 139. As such, there is no constitutional infirmity. J.M.B., supra, 395 N.J.Super. at 97, 928 A.2d 102.
W.X.C. does not argue that the SVPA is unconstitutional because it is generally punitive in nature. Instead, he contends that the statute became a covert vehicle for additional, unconstitutional punishment when the State failed to treat him while he was serving his sentence, only to civilly commit and treat him after he had served his sentence. W.X.C. relies on Justice Breyer's dissent in Kansas v. Hendricks, 521 U.S. 346, 381, 117 S.Ct. 2072, 2091, 138 L.Ed.2d 501, 527 (1997) (Breyer, J., dissenting) to support this contention.
In Kansas v. Hendricks, a closely divided Supreme Court held that there was no impediment, at least under the Federal Constitution, to a state, in that case Kansas, "civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." Id. at 366, 117 S.Ct. at 2084, 138 L.Ed.2d at 517. In his critical concurring opinion, Justice Kennedy observed that "[i]f the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish," the hallmark of an ex post facto law. Id. at 371, 117 S.Ct. at 2087, 138 L.Ed.2d at 521 (Kennedy, J., concurring).
Justice Breyer authored the dissent, which was joined by three other justices. He argued that Hendricks' confinement was not justified because there was inadequate evidence that Kansas intended the committees to receive treatment. Among the reasons supporting such a view was that the Kansas Act only seeks civil confinement after the offender has served his or her criminal sentence. Id. at 385, 117 S.Ct. at 2093-94, 138 L.Ed.2d at 530 (Breyer, J., dissenting). This statutory framework prompted Justice Breyer to pose the rhetorical question, "But why, one might ask, does the Act not commit and require treatment of sex offenders sooner, say, soon after they begin to serve their sentences?" Ibid. Justice Breyer went on to state that "[w]hen a State believes that treatment does exist, and then couples that admission with a legislatively required delay of such treatment until a person is at the end of his jail term (so that further incapacitation is therefore necessary), such a legislative scheme begins to look punitive." Id. at 381, 117 S.Ct. at 2091-92, 138 L.Ed.2d at 527 (Breyer, J., dissenting).
In his dissent, Justice Breyer carefully analyzed the Kansas statutory scheme to determine whether it was aimed at treatment as opposed to impermissible additional punishment. In doing so, he looked to Allen v. Illinois, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), an earlier civil commitment case, for guidance. In Allen, the Court set forth four factors to determine if a commitment statute is punitive. These factors were employed by Justice *471 Breyer in his analysis of the Kansas statute.
The first factor asks whether a state's highest court has held that treatment under that state's sexual offender commitment statute is a significant objective of the statute. Regarding the Kansas Act, the Kansas Supreme Court held that any goal of providing treatment was "incidental at best." Kansas v. Hendricks, supra, 521 U.S. at 383, 117 S.Ct. at 2092, 138 L.Ed.2d at 528. In New Jersey, our Supreme Court has held that SVPA is not punitive but "remedial," J.M.B., supra, 197 N.J. at 601, 964 A.2d 752, and regulatory. State v. Bellamy, 178 N.J. 127, 137, 835 A.2d 1231 (2003). Moreover, our Supreme Court in dicta has noted that the statute requires that the Division of Mental Health Services must provide "treatment tailored to address the specific needs of sexually violent predators." W.Z., supra, 173 N.J. at 120, 801 A.2d 205 (citing N.J.S.A. 30:4-27.34b).
The second factor Justice Breyer considered was the fact that the Kansas Act "explicitly defers diagnosis, evaluation, and commitment proceedings until a few weeks prior to the `anticipated release' of a previously convicted offender from prison." Kansas v. Hendricks, supra, 521 U.S. at 386, 117 S.Ct. at 2094, 138 L.Ed.2d at 530 (Breyer, J., dissenting). In New Jersey, we have a statutory scheme in place to provide treatment for certain sex offenders immediately upon conviction, so long as they meet the requirements of that statute.
Pursuant to N.J.S.A. 2C:47-1:
[w]henever a person is convicted of the offense of aggravated sexual assault, sexual assault, aggravated criminal sexual contact, kidnapping ... the judge shall order the Department of Corrections to complete a psychological examination of the offender .... The examination shall include a determination of whether the offender's conduct was characterized by a pattern of repetitive, compulsive behavior and, if it was, a further determination of the offender's amenability to sex offender treatment and willingness to participate in such treatment.
If the court finds that these criteria are met, the defendant must be placed in the custody of the ADTC. N.J.S.A. 2C:47-3(b). N.J.S.A. 2C:47-3(h)(2) also allows a defendant to request a transfer to the ADTC on a biennial basis, at which point the State is required to provide an evaluation and entertain the request.
In the event an inmate's conduct is not found to be "characterized by a pattern of repetitive, compulsive behavior," for example, it is found to be impulsive as opposed to compulsive, he may still obtain some treatment if he seeks it. N.J.A.C. 10A:16-4.3 requires a correctional facility to inform inmates how to gain access to mental health services. The inmate handbook, required to be provided to each inmate pursuant to N.J.A.C. 10A:8-3.2, explains the psychological and psychiatric services available. N.J.S.A. 10A:8-3.5(b)5. The Department of Corrections Internal Management Procedure (MED.MHS. 001.001) sets forth the procedure for inmates' access to mental health services. Its purpose is to:
A. Ensure appropriate access to mental health care;
B. Reduce the disabling effects of mental illness and enhance the inmate's ability to function within the prison environment;
C. Reduce or, when possible, eliminate suffering caused by mental illness;
D. Improve the safety of the prison environment and the community upon release; and

*472 E. Prepare the individual for reentry into the community by reducing the debilitating effects of mental illness and arrange for appropriate aftercare.
[MED.MHS. 001.001.]
If the inmate meets the criteria for classification as special needs, the inmate will receive appropriate services. Ibid. In addition, the prisons offer various social services programs, such as anger management courses, substance abuse programs, and reentry programs. Thus, unlike the Kansas Act, which does not provide an avenue for a defendant to procure treatment while incarcerated, our statutes and regulations clearly make treatment available to appropriate candidates throughout their sentences.
Third, Justice Breyer considered that "[l]egislation that seeks to help the individual offender, as well as to protect the public, would avoid significantly greater restriction of an individual's liberty than public safety requires." Kansas v. Hendricks, supra, 521 U.S. at 388, 117 S.Ct. at 2095, 138 L.Ed.2d at 531 (Breyer, J., dissenting). Under the New Jersey statutory scheme, committees are entitled to an annual review to determine if confinement is still necessary. N.J.S.A. 30:4-27.35. The court at any time may order a conditional discharge if it finds, upon the Department of Human Services' recommendation, that the individual is not likely to commit further acts of sexual violence. N.J.S.A. 30:4-27.32; W.Z., supra, 173 N.J. at 120-21, 801 A.2d 205. The SVPA is clearly designed to ensure that committees are not confined longer than necessary to provide effective treatment.
In addition, the liberty interests of offenders receiving treatment are protected and restricted only as much as necessary. N.J.A.C. 10:36A-2.1 states that a patient "shall not be deprived of a civil right solely by reason of receiving treatment under the provisions of the SVPA." Moreover, "[t]reatment shall not modify or vary legal or civil rights including but not limited to, the right to register for and to vote in elections, or rights relating to the granting, forfeiture, or denial of a license, permit, privilege, or benefit pursuant to any law." Exceptions are made only to those rights "related to providing a safe, secure facility or any appropriate concern." Ibid. Clearly, the SVPA is designed to protect the liberty interests of committees to a far greater extent than statutes aimed at punitive confinement.
Lastly, Justice Breyer considered the commitment laws of other states. At the time of writing his dissent, seventeen states had laws that sought to protect the public from sexually dangerous individuals through civil commitment. Kansas v. Hendricks, supra, 521 U.S. at 388, 117 S.Ct. at 2095, 138 L.Ed.2d at 532 (Breyer, J., dissenting). Ten of those statutes provided treatment immediately and only one other state besides Kansas delayed treatment and did not "explicitly consider less restrictive alternatives." Id. at 389, 117 S.Ct. at 2095, 138 L.Ed.2d at 532. In criticizing the Kansas Act, Justice Breyer noted that New Jersey's SVPA "generally do[es] not delay treatment." Id. at 389, 117 S.Ct. at 2095, 138 L.Ed.2d at 532. Also, as discussed above, New Jersey's statutory scheme provides immediate review of an individual to determine if treatment is appropriate and offenders may request subsequent reviews throughout their imprisonment. Annual reviews are also guaranteed. N.J.S.A. 30:4-27.35. These considerations place New Jersey in line with several other states' statutory schemes that the United States Supreme Court implicitly found satisfactory and not punitive.
*473 We first note in weighing W.X.C.'s ex post facto argument that a dissent is instructive but not binding. See Northern Sec. Co. v. United States, 193 U.S. 197, 400, 24 S.Ct. 436, 486, 48 L.Ed. 679, 726 (1904) (where Justice Holmes wrote "I think it useless and undesirable, as a rule, to express dissent...."). As such, W.X.C.'s reliance upon Justice Breyer's opinion in Kansas v. Hendricks is misplaced. However, even if we were to treat Justice Breyer's dissent as law, W.X.C.'s argument overlooks that all four factors from Allen were analyzed by Justice Breyer in order to conclude that the Kansas Act was, in fact, punitive. W.X.C. relies only on the second factor Justice Breyer considered, whether the statute in question defers diagnosis and commitment proceedings until a few weeks prior to the individual's anticipated release from prison.
As we explained above, this argument is itself unfounded because New Jersey does provide treatment immediately upon sentencing if a defendant qualifies under N.J.S.A. 2C:47-1 and affords mental health treatment under the prison's regulations if the appropriate criteria are met. Dr. Frank evaluated W.X.C. prior to his sentencing and determined that, while his behavior was repetitive, it was not compulsive and W.X.C. was not eligible for treatment at the time of his sentencing. Moreover, N.J.S.A. 2C:47-3(h)(2) permits defendants to request reevaluation and transfer to the ADTC program throughout their sentences. There is nothing in the record to suggest that W.X.C. made any attempt to utilize this statutory right or the mental health services available under the Department of Corrections regulations.
The three other factors enumerated in Justice Breyer's dissent likewise do not apply. The SVPA carefully preserves the liberty interest of committees with the need to protect the public and our Supreme Court has found that the statute requires committees to receive treatment. Justice Breyer himself stated that the SVPA is comparable to other states' commitment statutes and thereby suggested that it is not punitive. As such, we reject W.X.C.'s argument that, based on Justice Breyer's dissent, the SVPA violates the ex post facto clause as applied to his confinement.
Defendant also argues that the trial judge erred in relying on the opinions of Drs. Friedman and Feibusch because their opinions were based in part on the opinions of non-testifying experts. In In re Commitment of E.S.T., supra, 371 N.J.Super. at 575, 854 A.2d 936, we held that the experts at the SVPA hearing cannot simply parrot the findings of the doctors who author the clinical certificates in support of commitment but do not themselves testify at trial. In that case, the testifying experts based their opinions "substantially" on the opinions of the doctors who authored the defendant's clinical certificates. Those doctors never treated E.S.T., but only reviewed his records and conducted short interviews with him. Our primary concern in that case was that the trier of fact "may not be able to fairly evaluate the basis of the in-court opinions that rely upon out-of-court opinions effectively shielded not just from meaningful cross-examination, but from any cross-examination." Id. at 574, 854 A.2d 936.
However, we later elaborated that E.S.T. should not be read "to preclude reliance, in part, on prior evaluations conducted for other purposes, such as ADTC and other psychiatric evaluations conducted in connection with sentencing or for parole consideration." In re Civil Commitment of A.E.F., 377 N.J.Super. 473, 492, 873 A.2d 604 (App.Div.), certif. denied, 185 N.J. 393, 886 A.2d 663 (2005); *474 see also In re Commitment of J.S.W., 371 N.J.Super. 217, 225, 852 A.2d 1107 (App. Div.2004), certif. denied, 183 N.J. 586, 874 A.2d 1105 (2005). As long as the opinion ultimately rendered at the initial commitment hearing is that of the witness based on his or her own evaluation of the committee, prior offenses, and objective test data, the testimony is admissible. A.E.F., supra, 377 N.J.Super. at 492, 873 A.2d 604.
In this case, Drs. Friedman and Feibusch did not simply "parrot" the findings of the psychologists who provided the State's certificates in support of W.X.C.'s commitment. Both doctors reviewed W.X.C.'s prior offenses and statements to the police, his ADTC and other psychiatric evaluations conducted prior to sentencing, his presentence reports and objective test data, such as his score on the Static-99 test. They testified that their opinions were their own and that they did not rely on other professionals' diagnoses. Both doctors were thoroughly cross-examined on their findings. Moreover, Drs. Friedman and Feibusch attempted to interview W.X.C. prior to rendering their opinions on his commitment and W.X.C. refused. He cannot now argue that their testimony should not be considered because they did not evaluate him through interviews.
Because the State's testifying experts did not merely rely on reports prepared by non-testifying evaluators for the express purpose of civilly committing W.X.C., and because W.X.C. had ample opportunity to cross-examine those experts, the trial judge did not err in considering their opinions.
Lastly, defendant contends that "[t]he evaluations prepared by non-testifying experts constitute hearsay, do not comply with N.J.R.E. 703, and should not have been admitted as exhibits at trial." Evidentiary decisions of a trial judge are reviewed utilizing the abuse of discretion standard. J.H.M., supra, 367 N.J.Super. at 612, 845 A.2d 139; State v. Brown, 170 N.J. 138, 147, 784 A.2d 1244 (2001). While out-of-court statements used to prove the truth of the matter asserted are inadmissible hearsay, see N.J.R.E. 802, an expert who substantially relies on hearsay evidence for his or her opinion may testify at trial as long as the hearsay information was of a "type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." N.J.R.E. 703; see Biunno, Current N.J. Rules of Evidence, comment 7 on N.J.R.E. 703 (2008) (citing State v. Torres, 183 N.J. 554, 576, 874 A.2d 1084 (2005)). "However, hearsay is not admissible substantively as establishing the truth of the statement." State v. Vandeweaghe, 351 N.J.Super. 467, 480, 799 A.2d 1 (App.Div. 2002), aff'd, 177 N.J. 229, 827 A.2d 1028 (2003). A psychiatrist is permitted to testify about a defendant's prior criminal history in order to offer an opinion about a defendant's mental condition. State v. Eatman, 340 N.J.Super. 295, 302, 774 A.2d 571 (App.Div.), certif. denied, 170 N.J. 85, 784 A.2d 718 (2001).
Here, the testifying experts relied on reports concerning W.X.C.'s mental health, his criminal history, police reports, and clinical tests in rendering their opinions. Both doctors testified that these sources of information were of the type typically relied upon by experts in performing risk assessment. The trial judge considered the experts' opinions, but did not allow the "wholesale and uncritical admission of prior forensic evaluations." J.M.B., supra, 395 N.J.Super. at 95, 928 A.2d 102. To the contrary, she properly used the hearsay reports "as background in evaluating the opinions of the ... experts, who testified that they considered these reports in reaching their own diagnoses." J.S.W., supra, 371 N.J.Super. at 225, 852 A.2d *475 1107 (quoting In re Civil Commitment of A.X.D., 370 N.J.Super. 198, 202, 851 A.2d 37 (App.Div.2004)). As such, we find no abuse of discretion and affirm.
Affirmed.
STERN, P.J.A.D., concurring.
W.X.C. contends that his commitment for sex offender treatment following service of his custodial sentence without such treatment violates the Ex Post Facto Clauses of the Federal and State Constitutions. The law concerning sentencing to the Adult Diagnostic and Treatment Center under the Sex Offender Act, N.J.S.A. 2C:47-1 to -10 (as successor to N.J.S.A. 2A:164-1 et seq.), long pre-dates the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24 to -27.38. The former is more limited in several respects; the latter is not limited to the same offenses or offenders. Under the SVPA:
A "sexually violent offense" can be any offense specifically listed as such in the SVPA. See N.J.S.A. 30:4-27.26(a) (subsection (a)). It can also be "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." N.J.S.A. 30:4-27.26(b) (subsection (b)). [In re Civil Commitment of J.M.B., 197 N.J. 563, 569, 964 A.2d 752 (2009).]
The Sex Offender Act and SVPA employ "different definitions and [have] different criteria for their application." In re Civil Commitment of J.S.W., 371 N.J.Super. 217, 223, 852 A.2d 1107 (App.Div.2004), certif. denied, 183 N.J. 586, 874 A.2d 1105 (2005). With respect to the crimes covered by the Sex Offender Act, defendant's conduct must be "characterized by a pattern of repetitive, compulsive behavior," and as we have said in J.S.W.:
For sentencing purposes [under the Sex Offender Act], a defendant must acknowledge his sexually offensive conduct in order to be amenable to treatment and must accept his need for treatment and must be willing to participate in treatment. For civil commitment purposes [under the SVPA], a person convicted of a sexually violent offense must be found to suffer "from a mental abnormality or personality disorder" that puts him at risk to commit further acts of sexual violence if not confined. Admissions, amenability to treatment or "sexual compulsion" are not required for civil commitment under the SVPA. [In re Commitment of W.Z.], 173 N.J. [109,] 129, 801 A.2d 205 [(2002)]. Rather, "[t]he focus of the SVPA is on the subject's current mental condition and the present danger to the public." In re Commitment of P.C., 349 N.J.Super. 569, 582, 794 A.2d 211 (App. Div.2002).
[Ibid.][1]
Our Supreme Court has consistently rejected ex post facto challenges to the SVPA. See J.M.B., supra, 197 N.J. at 601, 964 A.2d 752.[2] However, independent of *476 constitutional compulsion, I believe that the Legislature should revisit the Sex Offender Act in Chapter 47 of the Code in light of subsequent developments concerning the treatment of sex offenders. There is a real need to punish and deter these criminal acts, butas this case suggests there may also be valid reasons not to delay the treatment of sex offenders who do not now fall within the purview of Chapter 47. Our sentencing and treatment of sex offenders may well benefit from legislative review of the issues we have addressed on this appeal.
NOTES
[1] As recently stated by the Supreme Court, "[i]n commitment proceedings, the State must demonstrate by clear and convincing evidence that the individual poses `a threat to the health and safety of others if he or she were found ... to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not control his or her sexual violent behavior and will reoffend.'" In re Civil Commitment of J.M.B., 197 N.J. 563, 571, 964 A.2d 752 (2009), (quoting In re Commitment of W.Z., 173 N.J. 109, 130, 801 A.2d 205 (2002)). See also W.Z., supra, 173 N.J. at 133-34, 801 A.2d 205.
[2] While the Department of Human Services is responsible for SVPA treatment, "[t]he Department of Corrections shall be responsible for the operation of any facility designated for the custody, care and treatment of sexually violent predators...." N.J.S.A. 30:4-27.34(a), (b). This is not the occasion to develop whether an involuntary SVPA commitment proceeding can be commenced while defendant is serving a sentence before he is "scheduled for release upon expiration of a maximum term of incarceration." See N.J.S.A. 30:4-27.28(c). See also N.J.S.A. 30:4-27.32(b).