# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0597-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.E.R.G.,

     Defendant,

and

S.P.,

     Defendant-Appellant.

_____

IN THE MATTER OF C.P.R.,
M.P.R., A.P.R., M.P.R., and
E.P.R., minors.

_____

Submitted January 28, 2025 – Decided March 3, 2025

Before Judges Gilson and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0050-20.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Phuong Dao, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Cohen, Assistant Attorney General, of counsel; Lisa J. Rusciano, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors C.P.R., M.P.R., A.P.R., and M.P.R. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant S.P. (Sam) seeks reversal of a Family Part's February 17, 2021 order following a fact-finding hearing, N.J.S.A. 9:6-8.44, that determined he had "abused or neglected" his daughters C.P.R. (Cathy) and M.P.R. (Megan)[1] by committing acts of sexual assault, sexual molestation, and sexual penetration over the course of several years and placed him on the state Child Abuse Registry. Because Cathy had reached the age of legal majority, the order also

---

[1] We use initials and pseudonyms to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

A-0597-23

dismissed her from the FN matter but continued her protection under the FC docket.

Subsequent permanency and compliance hearings were held in 2021 and 2022. On July 11, 2022, Megan had reached the age of legal majority and was dismissed from this case. Disposition orders followed with the Division of Child Protection and Permanency (DCPP) retaining legal and physical custody of the children, A.P.R. (Agatha), M.P.R. (Mandy) and E.P.R. (Evan), and permitting visitation as to Mandy and Evan. Evan and Mandy were reunited with M.E.R.G. (Mary) in the Dominican Republic in April and June 2023, respectively. On September 11, 2023, Agatha had reached the age of legal majority and was also dismissed from this case.

On September 11, 2023, the Family Part entered an order terminating the Title Nine litigation. Sam now appeals. DCPP and the Law Guardian urge this court to affirm the Family Part's order. Having considered the arguments raised in light of the record and applicable legal standards, we affirm the February 17, 2021 fact-finding order.

I.

We summarize the facts presented in the testimony and the evidence admitted at the fact-finding hearing. Sam and Mary are the parents of five

children: Cathy, Megan, Agatha, Mandy, and Evan. In 2015, Sam had custody of his children when they came to the United States. They have resided with their paternal grandparents, a paternal uncle, and two adult siblings in a three-bedroom single family home in Carteret (Carteret home). The four girls shared one bedroom with two sets of bunk beds. Mary resides in Santiago, Dominican Republic with her other three children.[2]

The family became known to DCPP in September 2019, from a Carteret Police Department (CPD) report concerning allegations of sexual abuse and sexual molestation. The oldest girls, Cathy and Megan (collectively, the girls) were taken to the CPD Headquarters by a social worker/friend, a paternal cousin, and a priest after disclosing sexual abuse in their Carteret home.

CPD Detective Javier Diaz conducted a preliminary interview with the girls. Megan, then-fifteen years old, reported that Sam had vaginally penetrated her a few months before her disclosure. Cathy, then sixteen years old, reported that Sam fondled her when they resided in the Dominican Republic when she was ten years old and had made a recent attempt to again fondle her.

---

[2] No claims of abuse or neglect were made against Mary. She did not appear at the fact-finding hearing. Mary also did not participate on appeal. Evan was represented by separate counsel than the other four children and did not take a position at the fact-finding hearing or on appeal.

Mercer County Prosecutor's Office (MCPO) Detective Amanda Espinosa was unsuccessful in contacting Mary and gave DCPP's Special Response Unit (SPRU) caseworkers permission to interview the girls. Cathy gave the SPRU workers a history of domestic violence involving Sam chasing her mother with a machete and punching her in the stomach while she was pregnant. She also reported Sam was hospitalized after twice attempting suicide.

Cathy reported Sam, while "intoxicated and possibly high on cocaine," initially "fondled" her when she was unclothed at ten or eleven years old in the Dominican Republic. She also reported that sometime in 2017, Sam attempted to touch her when they were alone in the Carteret home, and she threatened to call the police or kill him. Cathy also reported a few months before September, Sam "grabbed [Cathy] by the neck and tried to get her to go to the basement, for something, but she refused to go so it ended there." She stated Sam "touch[ed] her all over her body" on at least six occasions.

A few weeks before coming to CDP headquarters, Cathy disclosed this incident to the social worker, then her paternal cousin, and later Megan. Cathy wanted Sam to "leave the home and never repeat his actions." She denied any domestic violence in the Carteret home.

A-0597-23

Megan reported that four months before the end of 2018-2019 school year, she and Sam were home alone. He entered her bedroom while she was resting on her bed, "touch[ed] her breast and vaginal area," and then "penetrated her vaginally with his penis." He "immediately" stopped, "caught himself," and said, "he should not be doing [that]." The next day, Sam apologized. Megan said the abuse happened only once and she did not tell anyone.

Megan denied physical violence and she did not feel safe with Sam. She shared Sam tried to touch Agatha, her fourteen-year-old sister, when Megan had left the home early one day.

Following the initial interviews with detectives and SPRU caseworkers, the friend/social worker took the girls to their paternal cousin's home because it was the "safest place for them."

The next day, DCPP investigators Jaime Carbajal and G. Garcia[3] commenced their investigation and interviewed the three minor children at their respective schools in the presence of school personnel. Initially, Mandy denied being touched by anyone. However, she then reported that a mute male living in the home "always tried to touch her or get close to her" but she did not allow it. Mandy and Evan did not have any knowledge of Sam's inappropriate contact

---

[3] The record does not contain Garcia's first name.

or sexual assault of Megan and Cathy. Evan and Agatha did not witness any domestic violence and denied any inappropriate touching. However, Agatha reported Cathy said "something happened" in the kitchen and Cathy told Sam not to do it again.

The investigators then interviewed Cathy and Megan at their cousin's home. They stated that they wanted their father to go to jail. Also, they explained that Mary had not answered their calls.

During an unannounced visit to the Carteret home, the investigators interviewed the adult female sibling, paternal grandfather, and paternal uncle. All of them claimed that they were not aware of any abuse.

Shortley thereafter, Sam met with the SPRU investigators. Sam was told DCPP received a sexual abuse allegation that "someone" had touched his girls. He responded: "[H]e [did] not know anything" and the girls did not speak to him about anything. Sam "appeared nervous," "tapp[ed] his foot on the floor," his "hands [shook]" and he "rubb[ed] his hands together." After drinking water in the kitchen and returning to the living room, Sam was again asked if he heard about an adult touching his girls in an inappropriate manner, he responded: "[N]o."

A-0597-23

After Sam was told that he was identified as the perpetrator and was asked a series of questions about touching the girls, Sam said: "nothing happened. [I] did not do anything. I did nothing or touch[ed] anything." In response to the direct question if he had touched his girl's breast, he replied, "no, but it almost happened." Asked to explain what that meant, Sam repeated "nothing happened. It almost happened."

In response to the pointed question of what happened with Cathy in the Dominican Republic, Sam replied, "nothing happened. It almost happened." Sam was quiet when asked where the touching occurred. However, he said "yes" when asked if the touching occurred in their home. Sam repeatedly denied anything happened with Cathy in Carteret.

In response to a series of questions concerning whether Sam touched Megan, he said: "yes, it happened years ago but it almost happened." Sam then told the caseworkers the incident occurred in Megan's bedroom while both of them were on the bottom bunk. He denied touching Megan while on her bed and stated, "nothing happened, it almost happened." When asked if he penetrated Megan, Sam responded: "I feel ashamed for what happened, and I feel guilty." He admitted that his penis "touched" Megan's vagina but denied

8

that he penetrated her. As to whether he had an erection, Sam replied: "It almost happened, it did not happen."

Following the interview, DCPP made the decision to take temporary custody of the children. Sam was asked to leave the home, and the children remained in the home to avoid placing them in different homes. However, after the grandparents blamed the girls for what had happened, DCPP conducted an emergency removal to a non-relative resource home.

Investigators were able to speak with Mary on Cathy's phone. She agreed with the girls' placement in the care of the paternal grandparents. Mary also reported that she had "no idea" of what happened, and she allowed her children to come to the United States for a "better future."

DCPP commenced the Title Nine action on September 9, 2019, seeking the care and supervision of the five children and appointment of a law guardian for the minor children. The next day, DCPP was granted temporary custody of the children. The court prohibited contact between Sam, Cathy, and Megan and ordered supervised visitation with the other three minor children.

Shortly thereafter, Cathy and Megan were interviewed by CPD Detective Reyes and MCPO Espinosa. Cathy retold the initial abuse. She then provided graphic details of the remaining incidents.

9

The next four incidents also occurred in the Dominican Republic. Sam repeatedly touched Cathy, and she saw his erect penis. Cathy told her brother, and he responded that it could not have happened. Shortly after that incident, Sam entered Cathy's grandmother's bedroom wearing a towel and told Cathy to take her clothes off. He then threw Cathy on the bed, touched her "everywhere" and tried to remove her pants. Sam removed his towel, and Cathy saw his erect penis.

During another afternoon, Cathy was alone and asleep in her bedroom. Cathy awoke without clothes on, and Sam was on top of her. While holding both of Cathy's hands over her head with one hand, Sam did "everything," forcibly penetrated her vagina, and caused "a lot of pain in her stomach." According to Cathy, "it did not last long." Sam apologized, and "did it again." She saw semen on the bed but did not see him ejaculate. He apologized again.

The next incident occurred when Cathy was "almost twelve years old." When she came out of the shower with a towel wrapped around her, Sam pushed her on the bed, held her down with his hands, and removed his clothing. He penetrated her but did not ejaculate. Sam stood up and said: "[I] can't do it," apologized, and left the home.

10

The last time Sam touched Cathy was in the Carteret home. She was in the kitchen cooking when Sam touched her neck and licked her ear. Later that day, he attempted to do the same thing. Sam also continued to hug her "very tightly" and she could not breathe. Sam told her to go the basement, and she refused. Although a cousin was in the home, Cathy did not say anything.

Megan reported Sam first touched her inappropriately when he tried to touch her breast when she was fourteen years old. Initially, Sam applied Vicks to bug bites on her back. He then moved his hands past her side, and eventually put his hands under her bra and touched her breast.

Megan provided more graphic details about the incident that happened before she graduated from middle school in 2019. While she was asleep and "out of it" from anesthesia following a dental appointment, Sam came into her bedroom after he showered and got on top of her. He held both of Megan's hands with one hand and "forcibly" penetrated her. Afterwards, Sam said he was sorry and "he [did] [not] know what happened." Megan did not tell anyone until that day.

A fact-finding hearing took place over three non-consecutive days on July 6, September 14, and October 30, 2020. DCPP presented testimony from Megan, Carbajal regarding the SPRU report, and Dr. Thailyn Alonso, a licensed

A-0597-23

clinical psychologist, concerning the psychological evaluations of Cathy, Megan and Agatha. The SPRU report and Dr. Alonso's report were admitted into evidence without objection. DCPP submitted Cathy's out-of-court statements through exhibits and testimony from those witnesses and various DCPP records. Sam did not testify or present any evidence.

In a February 16, 2021 written opinion, the trial court found Sam committed acts of sexual abuse against Cathy and Megan. The court rejected Sam's contention that Cathy and Megan "concocted" their stories because they were unhappy with the rules at home.

The court credited the testimony of Megan, Carbajal, and Dr. Alonso. The court found Megan was "soft-spoken," "stoic," "deliberate" and "demonstrated consistent testimony on both direct examination and cross-examination." She explained the incidents to the court and conversations with DCPP caseworkers and investigators without "embellishment" and when compared to the records in evidence, she "did not exaggerate or deviate from the contents of her disclosure."

The court also found Carbajal credible based on his recall of the case under both direct and cross-examinations. The court found Carbajal clearly testified, without embellishment, and accurately described the interviews

12

conducted with Sam and his family members.  The court further reasoned, Carbajal's testimony did not "exaggerate or deviate" from the SPRU report.

Lastly, the court found Dr. Alonso credible given her recall and consistent testimony under both direct and cross-examination.  She testified that the girls were administered the Behavior Assessment System for Children (BASC) Self-Report of Personality, which is a "well-establish[ed] tool used in school clinical settings for assessing behavioral and emotional problems in adolescents."  Dr. Alonso explained her psychological opinion and diagnosis of Cathy and Megan.

Based on Dr. Alonso's observations of Cathy during the interview, she opined Cathy did not meet the criteria for post-traumatic stress disorder (PTSD) in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-V) but presented with symptoms significant enough to be diagnosed with PTSD and in need of services based on her observations and a review of DCPP documents and Cathy's history.  Cathy "appeared sad" and her "affect remained sad throughout the evaluation" and "[a]t times during the interview she was noted to dissociate."  When Cathy discussed her trauma and sexual abuse, she "sudden[ly] . . . stare[d] off into the distance" and "described herself as floating."  Cathy "visibly tremble[d]," "vigorously

13

picked at her nail polish," and became "more dysregulated" the more the abuse was discussed.

Dr. Alonso opined Megan exhibited "atypical" behavior of a fifteen-year-old: the desire to bathe around Sam; self-harm; the home stressor; the feeling of disgust when around Sam; the desire to want justice for the abuse on her and abuse of Cathy; and the belief it was inappropriate for a father to have sex with his children. While Dr. Alonso did not diagnose Megan with post-traumatic stress disorder (PTSD) because she did not meet the criteria, she opined Megan experienced trauma and "present[ed] with symptoms that . . . were significant and that should be targeted in treatment."

The court found Dr. Alonso's report was written in "simple terms" and considered the girls' statements made as well as the treatment recommendations. Therefore, the court found Dr. Alonso's report credible and trustworthy.

Regarding her interview with Cathy, Dr. Alonso corroborated the out-of-court statements made by Cathy. She testified that Cathy disclosed six to seven instances of vaginal penetration by Sam. Alonso testified Cathy reported suicidal ideation and attempted to end her own life when she was eleven, which was not disclosed to anyone.

A-0597-23

As to Cathy's out-of-court statements, the court credited Megan's testimony about Cathy's disclosure of abuse to Megan. The court also found Sam's statement made to Carbajal that "it almost happened, nothing happened," while "vague" was "not an outright denial." Finally, the court determined Dr. Alonso's expert testimony was substantive evidence that corroborated Cathy's allegation of sexual abuse and her expert opinion regarding PTSD in relation to Cathy's behavior exhibited during the psychological evaluation.

II.

On appeal, Sam argues the Family Part's finding that he sexually abused his daughters pursuant to N.J.S.A. 9:6-8.21(c)(3) was "clearly erroneous" and unsupported by the evidentiary record. He argues the court incorrectly relied on Cathy's out-of-court statements and Megan's testimony, which were made in "retaliation" against his rules. Sam further argues that DCPP's investigation and Dr. Alonso's psychological evaluation of the girls were the "equivalent" of repeated allegations by Cathy and Megan and were "too indirect" to support a finding of abuse or neglect. Sam's arguments are not supported by the record.

"[W]e accord substantial deference and defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super.

513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014)). "This is '[b]ecause of the family courts' special jurisdiction and expertise in family matters.'" N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 155 (App. Div. 2018) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010)).

Reversal is warranted only when a trial judge's findings are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div.), certif. denied, 40 N.J. 221 (1963)) (internal quotation marks omitted). Further, the trial judge's "interpretation of the law and the legal consequences that flow from established facts" are not subject to deference and are reviewed de novo by this court. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Accordingly, we do not "second-guess or substitute our judgment for that of the family court," so long as "the record contains substantial and credible evidence to support [its] decision . . . ." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012).

16

Title Nine provides that an "[a]bused or neglected child" is "a child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child." N.J.S.A. 9:6-8.21(c)(3). The Division has the burden of proving abuse or neglect by a preponderance of "competent, material and relevant evidence." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)) (internal quotation marks omitted). Thus, in finding neglect, the court must base its determination on the totality of the circumstances. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

We first address Sam's argument that Cathy's out-of-court statements and Megan's testimony concerning sexual abuse were made in "retaliation" against his rules. We do not find these arguments persuasive.

A child's out-of-court statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). Therefore, "a child's hearsay statement may be admitted into evidence, but may not be the sole basis for a finding of abuse or neglect." N.J. Div. of Child Prot. & Permanency v. J.A., 436 N.J.

Super. 61, 67 (App. Div. 2014) (quoting N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011))

Corroboration is not required "where the child victim testifies to the abuse at a fact-finding hearing." N.J. Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 542 (App. Div. 2014). The statute requires corroboration specifically for "previous statements made by the child . . . ." Id. at 547 (quoting N.J.S.A. 9:6-8.46(a)(4)).

Having reviewed the record, we conclude there is no basis to disturb the court's findings as to Cathy's out-of-court statements. At trial, Sam agreed and stipulated to Dr. Alonso as an expert in clinical psychology and did not object to her report. Nor did Sam object to statements made by Cathy to Carbajal. Sam did not raise this issue in the family court. Generally, we decline to address issues raised for the first time on appeal. US Bank Nat. Ass'n v. Guillaume, 209 N.J. 449, 483 (2012) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

However, for the sake of completeness, we address the issue. The court credited both Megan's and Carbajal's testimony as consistent and without embellishment when compared to DCPP records.

A-0597-23

We are convinced the court correctly relied on N.J. Div. of Child Protection and Permanency v. I.B., 441 N.J. Super. 585 (App. Div. 2015) in ruling that Dr. Alonso's opinion concerning the nature of Cathy's symptoms and her diagnosis sufficiently corroborated Cathy's out-of-court statements of sexual abuse.  Corroboration may be established by evidence of emotional impacts, as in this case, Cathy's disassociation, self-harm, and "vigorously" picking at her nail polish.  See N.J. Div. of Youth and Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002).

We defer to the trial court as the fact-finder and to its "acceptance of the credibility of the expert's testimony and [its] fact-findings based thereon," because it "is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded [his or her] testimony."  In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999); see also In re Civil Commitment of W.X.C., 407 N.J. Super. 619, 640 (App. Div. 2009). Accordingly, we hold there was ample evidence in the record supporting the court's finding, including Cathy's disclosures.

Regarding Megan's testimony, Sam makes nothing more than a bald assertion that is unsupported by the record.  Again, the court found that Megan's testimony was consistent on direct and cross-examination and with the prior

disclosures when compared to DCPP records about the abuse that she experienced. The court also properly credited Megan's testimony regarding statements made by Cathy to her.

Equally unavailing is Sam's contention that the DCPP's investigation and Dr. Alonso's psychological evaluation were "too indirect" to support a finding of abuse or neglect. As noted above, Sam did not challenge either the sufficiency of the investigation or Dr. Alonso's report at trial. Sexual abuse is defined, in part, as "the . . . coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct[.]" N.J.S.A. 9:6-8.84(a); Z.P.R., 351 N.J. Super. at 436. "In most cases of child sex abuse, however, there is no direct physical or testimonial evidence." Id.

Here, Sam consented to the admission of DCPP documents and Dr. Alonso's report into evidence. The court also heard testimony from Carbajal and Dr. Alonso and therefore was afforded the opportunity to assess their credibility.

In sum, the Family Part court appropriately evaluated the evidence presented, made findings of fact supported by the credible evidence in the record, and correctly applied controlling law. Given our own review of the

20

record, we perceive no basis to disturb the court's ruling DCPP met its burden in proving Sam sexually abused Cathy and Megan.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

21