# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2006-20

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

P.F. and J.F.,

      Defendants-Appellants/
      Cross-Respondents,

and

J.C.,

      Defendant.

_____

IN THE MATTER OF J.C., a minor,

and

IN THE MATTER OF D.F., a minor,

      Cross-Appellant.

_____

Submitted November 6, 2023 – Decided July 31, 2024

Before Judges DeAlmeida, Berdote Byrne, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County Docket No. FN-09-0121-19.

Williams Law Group, LLC, attorney for appellants/cross-respondents P.F. and J.F. (Victoria D. Miranda and Elizabeth D. Burke, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent Division of Child Protection and Permanency (Sookie Bae-Park, Assistant Attorney General, of counsel; Lisa J. Rusciano, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor J.C. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor/cross-appellant D.F. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Margo Hirsch, Designated Counsel, on the briefs).

PER CURIAM

Defendants P.F. and J.F. appeal from an April 24, 2019 order of the Family Part finding that: (1) J.F. abused and neglected J.C., who is P.F.'s daughter and J.F.'s stepdaughter, by repeatedly sexually abusing her; and (2)

2

P.F. abused and neglected J.C. by not acting to protect J.C. after she disclosed the sexual abuse to P.F. on two occasions.  D.F., the son of P.F. and J.F., cross-appeals from the April 24, 2019 order.[1]  We affirm.

I.

J.C. was born to P.F. and her then husband in 2003.  Following P.F.'s affair with J.F., the couple divorced.  J.C. admitted that she attributed her parents' divorce to P.F.'s relationship with J.F., but stated that she blamed P.F., not J.F. According to J.C., she later stopped blaming P.F. for the divorce, realizing that her parents married too young.  P.F. and J.F. had a son, D.F.

In 2017, J.C. lived with P.F., J.F., and D.F. in a two-family home. Members of P.F.'s family, including J.C.'s cousins, lived in the other unit.

On August 1, 2018, plaintiff Division of Child Protection and Permanency (DCPP) filed a complaint in the Family Part for the care and supervision of J.C. and D.F. pursuant to N.J.S.A. 9:6-8.21 and -8.73 and N.J.S.A. 30:4C-12.[2]

The complaint alleged that for several months, beginning when J.C. was in eighth grade, J.F. repeatedly sexually abused her.  According to the complaint,

---

[1]  We use initials to protect the confidential record.  R. 1:38-3(d)(12).

[2]  J.C.'s father, defendant J.C., was also named in the complaint.  He is not participating in this appeal.

J.C. disclosed the sexual abuse to P.F. on two occasions. On neither occasion did P.F. report the abuse to police or DCPP. After the first disclosure, P.F. accepted J.F.'s denial of having touched J.C. inappropriately. Following the second disclosure, P.F. took J.C. for a polygraph test, which the child purportedly failed. P.F. believed the test results and took no further steps to protect J.C. from J.F.'s sexual abuse. P.F. subjected J.C. to disparaging remarks and isolation from the family. The complaint also alleged that P.F. and J.F. physically abused both children and that P.F. medically neglected J.C.

Shortly after the complaint was filed, the court interviewed J.C. in camera. The interview was admitted as evidence at a later fact-finding hearing.

After an investigation, DCPP substantiated the allegations of sexual abuse against J.F. and emotional abuse and failure to protect against P.F. DCPP did not substantiate the remaining allegations, finding that the alleged physical abuse of D.F. was "unfounded," and the physical abuse and medical neglect of J.C. was "not established." The matter proceeded to a fact-finding hearing.

J.C. testified in person briefly at the hearing to authenticate videos. Otherwise, she testified in chambers with her Law Guardian present. Her testimony was transmitted simultaneously to the courtroom, where the parties and counsel observed. Counsel had the opportunity to review one another's

4

questions in advance and to raise objections. After the court completed each round of questions, it asked counsel if they had additional questions. The court asked all questions raised by counsel.

J.C. testified that when she was in seventh or eighth grade, she was in her bed when J.F. entered her room, put his hand down her shirt, and grabbed her breast. J.C., in shock and "totally frozen," pretended to be asleep. The following day, J.C. reported the abuse to her mother. P.F. confronted J.F., who denied the inappropriate touching, claiming J.C. "was falling off the bed," so he moved her. P.F. accepted J.F.'s explanation and "brushed [it] off like nothing."

J.C. was unsure how much time passed before J.F. began sexually abusing her more regularly. She testified that the second incident happened near the end of eighth grade. J.C. recalled that P.F. and J.F. had returned home from a party "a little drunk," and, after P.F. went to bed, J.C. and J.F. watched the television show "13 Reasons Why." J.F. asked J.C. about her pubic hair and if she had ever seen "a man's private part." He then took his penis out of his pants and told J.C. "to look at it and touch it." J.C. described J.F.'s penis in detail, stating that he was not circumcised and had two scars, one on his stomach and one "right above his actual private part" that was "way whiter than the rest of his skin."

A-2006-20

J.F. went to his bedroom, retrieved his cell phone, and showed J.C. pornography. J.F. told J.C. to lay down next to him. He put his hands down her pants, "touched [her] boobs and everything," and put "his mouth . . . on [her] body." He then turned the television off and touched himself while touching her vagina. When P.F. came out of the bedroom for water, J.F. immediately stopped, "sat up," and pretended that he was asleep.

The next day, J.F came into J.C.'s room and told her that she "can't say anything obviously about what happened," and that he hoped he could "be like" her dad. She connected this to ongoing discussions about J.F. adopting her. J.C. said she "didn't have a male figure in her life," and was "craving . . . attention, but in the wrong ways." J.F. became her "best friend pretty much" and she told him "everything." J.C. thought of J.F. "as more of a boyfriend" and said that he was "the first guy to ever put his hands on [her] like that."

J.C. estimated that after the second incident, J.F. abused her "almost weekly, monthly." She testified that P.F. abused her twenty to thirty times and that it happened so often the abuse "was normal to" her.

The abuse initially involved "everything but" penetration. However, after J.C. told J.F. she had lost her virginity to her boyfriend, J.F. began to digitally penetrate J.C., one time causing her to bleed. When she was fourteen and in the

6

ninth grade, J.F. began performing oral sex on her. J.C. also described other incidents, including J.F. masturbating with baby oil in her presence, touching her under a blanket with P.F. in the next room, and watching her shower. He often used a white t-shirt to clean himself after the abuse.

During the summer of her eighth-grade year, J.C. had a sleepover with her cousin C.T. The girls drank alcohol and J.C. vomited in her room. Because of the smell, J.C. slept in D.F.'s room for a several days, while D.F. slept in the other unit. J.F. had a practice of using D.F.'s closet to store his clothes and changing in D.F.'s room. He continued to do so while J.C. slept there. She described several incidents of abuse that occurred in D.F.'s room.

J.C. took pictures and videos of herself at J.F.'s request. Three of these videos were played in court and offered into evidence. The first video showed J.C. speaking to someone as she set up a camera in the bathroom. J.C. testified that a male voice on the video was that of J.F., who had instructed her to record herself in the shower. The second video showed J.C. in the shower, and she believed it was taken the same day as the first video. The third video showed J.C. lying in bed with no pants on as a man she identified as J.F. climbed on top of her. Near the end of the video, J.C. called out D.F.'s name. The court heard a boy's voice in the video and J.C. testified that D.F. was visible in the recording.

A-2006-20

J.C. also photographed herself for J.F. wearing only underwear or while in the shower. She testified that J.F. avoided a digital footprint by not letting her send the photos directly to him. He instead used his phone to take pictures of the images on her phone. J.C. estimated that she took photos and videos of herself for J.F. ten to twenty times. She also testified that J.F. showed her nude photographs of P.F. and compared the two to each other. He also showed J.C. nude photos of "some blonde lady" from his work.

Defendants cross-examined J.C. about J.F.'s opportunity for abuse. J.C. said J.F. abused her both when P.F. was home and when she was out. J.C. testified that J.F. tracked P.F. with an application on his phone when she was not home. She testified that the abuse usually occurred at night, when P.F. had class, and when she slept in D.F.'s room. J.C. told a DCPP investigator the abuse occurred every day and told the prosecutor's office that the abuse occurred every day in the summer, and a few times a week during the school year.

J.C. agreed that J.F. was involved in D.F.'s after school activities. He coached his son's baseball team and took him to Cub Scouts meetings. J.C. disagreed that these activities prevented J.F. from abusing her, stating, "but guess what you do after you take him to Cub Scouts[,] you come home," adding this did not "stop anything from happening."

Defense counsel also asked J.C. if the residents of the two units at the house frequently visited each other, interfering with the opportunity for abuse. J.C. described having a "cordial" relationship with family members in the other unit, but denied they had an open-door policy.

J.C. made disclosures to several adults while the alleged abuse was occurring. No one, including P.F., reported the sexual abuse to police or DCPP until J.C. saw a therapist who made a report.

As noted above, J.C.'s first disclosure was to P.F. immediately after the first incident. J.C. also disclosed the abuse to her uncle, W.C., when she was in ninth grade. W.C. only urged J.C. to tell P.F., even though she told W.C. that P.F. already knew about the abuse and did not believe her.

J.C. disclosed the abuse to her father's girlfriend, A.B. A.B. also only urged J.C. to tell P.F. J.C. also disclosed the abuse to her teacher, C.P. She told C.P. "that something had went down" between her and J.F. J.C. thought C.P. understood what she meant because C.P. said, "oh my God, have you told your mom?"

In early December 2017, P.F. caught J.C. smoking and they had a physical fight. After this altercation, P.F. ordered J.C. to leave the home. J.C. moved in with W.C., and never returned to the family home.

A-2006-20

In late December 2017, J.C. was scheduled to visit P.F. W.C. told her that she could not go unless she told P.F. "what's going on." J.C. did not want to say anything but felt she had no choice because W.C. said he would tell P.F. if she did not. J.C. made a second disclosure to P.F., including reporting J.F.'s acts of digital penetration. P.F. then called J.F. and yelled at him.

According to J.C., although P.F. initially seemed upset after the second disclosure, she later acted "totally different." A few days later, P.F. scheduled a polygraph examination for J.C. On the day of the test, W.C. and J.C. met with P.F., who told J.C. that she did not believe her, that J.C. was a slut, and that she was going to send her to a mental institution if she failed the polygraph.

J.C. testified that P.F. and J.F. met with the polygrapher beforehand to pay him and briefed him about the allegations. After the test, the polygraph examiner called J.C. a pathological liar, said she was a "troubled girl," and recommended that P.F. seek mental health treatment for her.[3] The examiner also told W.C. not to contact the police because J.C. was lying and would accuse him next. P.F. later told the family that J.C. was a pathological liar.

---

[3] The court ruled that the result of the test was not admissible, because it is "not a science" and polygraph examiners were like "hired hands." The court did not limit J.C.'s testimony about taking the exam and P.F.'s reaction to the results.

A-2006-20

J.C. testified that P.F. told her not to speak about the abuse. J.C. complied because she did not want P.F. and J.F. to get in trouble. According to J.C., she kept her "mouth shut" even though "it was literally destroying [her] life."

J.C. spent time with P.F. after the polygraph. While she was never alone with J.F., he sometimes joined J.C. and the family for dinner.

J.C. testified that she suffered from anxiety her "whole life" and felt depressed "on and off" since age nine. Despite having engaged in self-harming behavior, J.C. was not "allowed to go to therapy" when she lived with P.F. After J.C. moved out, P.F. retained her insurance card, so she could not seek counseling on her own. P.F. also repeatedly claimed that no therapists were available to treat J.C. J.C. testified that P.F. told W.C. she was afraid of what J.C. would disclose in therapy.

J.C. began cutting herself again after she moved out. Her father noticed the marks and contacted P.F., who had J.C.'s insurance information. Having not received a response, the father took J.C. to his therapist because he considered the situation to be an emergency. J.C. disclosed J.F.'s sexual abuse to the therapist, who made a report to DCPP and police.

Several witnesses corroborated J.C.'s disclosures. W.C. confirmed J.C.'s first disclosure to him. He believed "something might have happened" with J.F.,

11

but because P.F. was involved and had accepted J.F.'s explanation, W.C. thought there was "nothing going on" and "everything was resolved." "I made a mistake," he added.

W.C. testified that J.C. disclosed to him a second time, telling him that the abuse was "getting really bad, very inappropriate." He again told J.C. to tell P.F. W.C. described his failure to intervene as "the regret of [his] life." He said that he should have notified the police the "minute [he] heard about it."

A.B. testified that J.C. confided in her twice. The first time was in November 2017, when J.C. disclosed that J.F. had "show[n] himself to her" and had touched her inappropriately. J.C. did not provide further details, and A.B. did not press her because she knew "how uncomfortable it [w]as to talk to someone about it." The second disclosure to A.B. was in December 2017, when J.C. told her she fell asleep while watching a movie with D.F. and J.F. and woke up feeling "sore." A.B. testified about additional disclosures from J.C., although she was less clear when these conversations took place. She corroborated disclosures of many of the episodes of abuse about which J.C. testified and about J.C.'s observation of scars near J.F.'s penis.

12

C.P., J.C.'s teacher, recalled that in December 2017, J.C. mentioned that "something happened in the home," and she could not go back. J.C. did not give details but said that it involved P.F. and J.F. and that P.F. "was siding with" J.F.

According to the DCPP report, C.P. told the DCPP investigator that J.C. had disclosed something "almost like molesting." When asked to clarify, C.P. said that J.C. never used the word molestation, but C.P. made that assumption based on what J.C. said and the absence of marks or bruises on the child. C.P. advised J.C. to speak to her guidance counselor but did not report J.C.'s disclosure. When questioned about the failure to report, C.P. testified that she had not observed any changes in J.C.'s demeanor and that J.C. had told "a lot of stories." According to the DCPP report, when the caseworker asked C.P. about her failure to report, she said, "I didn't know if to believe her or not because there are kids that lie about stuff like that."

Defendants presented several rebuttal witnesses. J.C.'s cousin testified that she lived in the other unit at the family home, and that they were "free to move" between the two units. She stated that P.F. "[h]ardly ever" locked the door to their family's unit. She also testified that she and J.C. had "binge watched" "13 Reasons Why" with other family members, and that they had watched all of the episodes together.

13

J.C.'s other cousin testified that she stayed at J.C.'s home for several weeks during the summer of 2017. She recalled that J.C. vomited after drinking one night, but denied that she moved into D.F.'s bedroom. She testified that she and J.C. were hardly ever apart that summer and J.C. never disclosed the abuse to her. She also testified that J.C. often made videos of herself and had posted videos of herself in the shower, using emojis to hide her breasts.

J.C.'s aunt testified that J.C. has "always been a liar," and lied if she was angry at someone. She said that J.C. made up stories about her parents, claiming P.F. made her walk to school while she drove D.F. in the car alongside her and that her father took her on drug deals. She added that when questioned, J.C. always admitted she was lying, and that she had never spoken to her about J.F.

After the therapist's report, DCPP began an investigation. The Hudson County Prosecutor's Office also began a criminal investigation. A detective interviewed J.C. and her father. The DCPP investigator was present for those interviews.

The DCPP investigator interviewed J.C., who reported both sexual abuse and physical abuse. J.C.'s statements to the investigator about the sexual abuse were largely consistent with her testimony.

A-2006-20

The DCPP investigator also interviewed P.F. When she broached the topic of sexual abuse, P.F.'s first response was, "I have a polygraph for you." P.F. told the investigator that J.C.'s laptop search history included "how to pass a polygraph test" and "my stepfather abused me," and that J.C.'s description of the abuse mimicked an online video. P.F. told the investigator that she had contacted a therapist for J.C. in January, but the waiting list was too long. She also scheduled an appointment at a hospital for J.C. after DCPP became involved. P.F. reported that J.C. "has a history of depression" and "continues to refuse counseling." She also claimed she had provided J.C.'s father with J.C.'s insurance card.

DCPP referred J.C. to Audrey Hepburn Children's House (AHCH) for a psychosocial evaluation. AHCH is a legislatively mandated regional diagnostic child abuse center that provides medical and psychological services for children.

Victoria Phillips, Ph.D. evaluated J.C., but was unavailable to testify at trial. DCPP instead proffered testimony of Michelle Mroz, MSW, LCSW, who was the clinical and administrative supervisor of Phillips's evaluation of J.C. Mroz co-signed the report. Mroz testified as an expert in child maltreatment.

J.C.'s report to Phillips of the sexual abuse was generally consistent with her testimony and prior disclosures. Mroz viewed J.C.'s disclosures as against

her own interest, because it cost her relationship with P.F. and threatened her relationship with D.F.

J.C. also reported experiencing intrusive thoughts and images daily. For instance, showering was difficult because J.F. used to watch her shower, but she showered twice a day because she felt "dirty." J.C. described being "triggered" and experiencing intrusive thoughts when she encountered things such as baby oil, J.F.'s cologne, white t-shirts, and the underwear he purchased for her.

As part of the evaluation, Phillips administered two psychological tests to J.C. The results showed that J.C. experienced anxiety and felt a lack of support, especially from her peers, which were consistent with her interview statements that she felt isolated from her friends and that P.F. was not supportive of her. The report concluded that the abuse "negatively impacted [J.C.'s] ability to trust others," that she was "generally scared of men," and appeared "wary of trusting individuals for fear they [were] using her for sexual pursuits." J.C.'s responses indicated that she "continue[d] to be affected emotionally by her abuse," which was consistent with her report of intrusive thoughts, feeling dirty, and varied emotions. Given this presentation, J.C. met the criteria for "Other Specific Trauma and Stressor Related Disorder."

16

The AHCH report found that there was clinical support that J.F. had sexually abused J.C. Mroz explained that a finding of "clinical support" is based on the information presented by the client, as well as the background and history provided. Here, according to Mroz, "[t]he clinical support was really based on the consistency of the child's statements," J.C.'s lack of motivation to lie, her maintaining the disclosure even though it was against her own interests, and her knowledge of J.F.'s anatomy.

AHCH also found clinical support for physical and emotional abuse of J.C. by P.F., citing P.F.'s use of physical discipline, her failure to protect J.C. after she reported the sexual abuse, and her negative reaction to the sexual abuse, which included threats, insults, and isolation from family. This impacted J.C. psychologically, insofar as she had difficulty trusting others and internalized negative beliefs about herself.

Mroz agreed that some of J.C.'s symptoms pre-dated the sexual abuse. J.C. had evidenced mistrust prior to her abuse, including in her diary entries, but Mroz noted that this was just one factor supporting the criteria. She also agreed that while J.C. expressed fear of men, she was comfortable staying with her father and W.C. Mroz explained that J.C.'s fear relates to men who are strangers.

17

Defendants cross-examined Mroz about J.C.'s motive to fabricate. Mroz agreed that J.C. kept a diary and had written a "Revenge List" which included P.F., W.C., and D.F., but she did not view this as relevant because J.C. "never spoke about [reporting] out of revenge." She also distinguished "a child's resentment towards a parent" from "their truthfulness about their report." While Mroz agreed that it was possible for a child to fabricate a story out of revenge, she never encountered that in her work, noting that children did not meet with her to speak about revenge, but about their "horrific experiences." Mroz also said it would be difficult for a child to repeatedly describe false allegations.

Defendants questioned Mroz about inconsistencies in J.C.'s disclosure, such as how much time had passed between the first and second incident, the order of events, how P.F. reacted when learning of the abuse, and slight differences of when certain events occurred. Mroz did not believe that J.C.'s "piecemeal" disclosures discredited the veracity of her allegations, explaining "[t]hat's how most children would disclose such traumatic events in their life." Mroz testified that a child may initially offer "small bits of information," and that as the child feels safe, he or she "can confidently" relay more information.

Sonia Oquendo, M.D., an expert in psychiatry, conducted a psychiatric evaluation of J.C. to determine whether she was suffering from mental illness

and to recommend treatment. Oquendo reached the following "diagnostic impressions:" improving PTSD; adjustment disorder with mixed anxiety and depressed mood; and borderline personality disorder traits.

Oquendo's evaluation was based on her interview with J.C. and her psychological testing. While J.C. referenced the sexual abuse during her interview, Oquendo did not pursue this line of questioning because she did not want to interfere with J.C.'s pending evaluations. J.C. reported having nightmares about "what [J.F.] used to ask her to do to him" and feeling guilty every day for her participation in the abuse. Oquendo attributed J.C.'s PTSD to a "series of events . . . that culminated in the sexual molestation," which Oquendo described as "the last straw."

On April 24, 2019, the trial court issued an oral decision. The court found that J.C.'s testimony was "extremely credible" and that there was "little, if any, inconsistency" in her multiple disclosures to multiple people. The court did not view as inconsistent J.C.'s uncertainty about how much time had passed between the first and second incidents, crediting Mroz's testimony that "difference in timeframes do not make a disclosure inconsistent." The court also noted that the "abuse happened over the period of the better part of a year," which would make it difficult for J.C. to remember every detail. The court also disagreed that

J.C.'s piecemeal disclosures impacted her credibility. The court credited Mroz's testimony that children make piecemeal disclosures to individuals to see how they react to the information and disclose more once they feel safe.

The court commented on J.C.'s demeanor while testifying, including her "answering several hundred questions straightforwardly" in a "direct" and "candid[]" manner, even when the questions were embarrassing, or her answers were against her own interest. The court found J.C. to be forthcoming about her past behavior such as lying to P.F. about school and smoking. The court also noted J.C.'s candor in acknowledging positive aspects of her relationship with P.F., her view that she encouraged the abuse with her appearance, and her failure to "discourage" J.F. The court disagreed that J.C. lied about the abuse as a form of "revenge," noting that J.C. did not blame J.F. for her parents' divorce. The court also noted J.C.'s testimony that she still loves and misses P.F.

The court found that testimony of W.C., A.B., C.P., and the experts to be credible, straightforward, and corroborative of J.C.'s testimony. The court dismissed the testimony of J.C.'s aunt and two cousins as unhelpful.

Based upon its findings, the court concluded that J.F. had sexually abused J.C. "over a period of the better part of a year." The court also found that P.F. had abused J.C. due to her failure to report the sexual abuse in violation of

20

N.J.S.A. 9:6-8.10, and her emotional abuse of J.C., as demonstrated by P.F.: calling J.C. a liar; subjecting J.C. to a polygraph test; failing to obtain therapy for J.C. both before and after the abuse; failing to facilitate J.C.'s therapy when she was living with her father and W.C.; and isolating J.C. from family. The court noted that P.F. had refused to participate in the AHCH evaluation. An April 24, 2019 order memorializes the trial court's decision.

P.F. and J.F. appealed.[4] They argue the court erred when it: (1) admitted J.C.'s testimony because it was not corroborated by psychological or physical evidence of J.F.'s sexual abuse; (2) relied on J.C.'s testimony, which was inconsistent and insufficient to support the findings of abuse and neglect; (3) admitted Mroz's testimony because she did not evaluate J.C. and offered a net opinion; (4) credited the AHCH evaluation, which was based on insufficient information; (5) concluded that DCPP provided sufficient evidence to support a finding of abuse and neglect against P.F.; (6) violated their Fifth Amendment right against self-incrimination by drawing an adverse inference from their

---

[4] Following entry of the April 24, 2019 order, the matter remained pending for nearly two years. Initially, J.C. lived with her father. However, on October 29, 2019, DCPP reported the father was "missing" and J.C. had moved in with W.C. She remained with her uncle until she aged out of services and started college. The court entered an order terminating the litigation on February 16, 2021.

refusal to participate in the AHCH evaluation; and (7) denied their request for an adjournment to retain an expert.

D.F. cross-appealed. He argues that the DCPP investigation was flawed, requiring reversal of the trial court's order.

## II.

We defer to Family Part judges' fact-finding because of their "special jurisdiction and expertise in family matters," Cesare v. Cesare, 154 N.J. 394, 413 (1998), their "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand[,] [and their] feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Fact-finding that is supported by "substantial credible evidence in the record" is upheld. N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of No. Amer., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

The "main focus" of Title 9, of which N.J.S.A. 9:6-8.21(c) is a part, is "the protection of children." Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 177 (1999)). An "[a]bused or neglected" child is

> a child less than [eighteen] years of age whose parent or guardian . . . (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [a] parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate . . . medical . . . care though financially able to do so . . . or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including . . . any other acts of a . . . serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c).]

Minimum degree of care "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., 157 N.J. at 178. More is required than ordinary negligence, but less is needed than an intentional infliction of injury. Ibid. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181.

In finding neglect, the court must base its determination on the totality of the circumstances. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). A finding of neglect must be based on a preponderance of the evidence. N.J.S.A. 9:6-8.46(b); N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 398 (2009).

A. Corroboration of J.C.'s Testimony.

P.F. and J.F. argue that J.C.'s testimony was inadmissible because it was not corroborated by psychological or physical evidence of abuse. They also argue that J.C.'s testimony was improper because it occurred in chambers. We do not find these arguments persuasive.

A child's out-of-court statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). Therefore, "a child's hearsay statement may be admitted into evidence, but may not be the sole basis for a finding of abuse or neglect." N.J. Div. of Child Prot. & Permanency v. J.A., 436 N.J. Super. 61, 67 (App. Div. 2014) (quoting N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011)).

Corroboration is not required "where the child victim testifies to the abuse at a fact-finding hearing." N.J. Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 542 (App. Div. 2014). The statute requires corroboration specifically for "previous statements made by the child . . . ." Id. at 547 (quoting N.J.S.A. 9:6-8.46(a)(4)). In Y.A., we held that corroboration was not required where the child testified in camera, described "the allegations of abuse in person," was "subjected to the rigors of cross-examination," and the court was able to "assess her demeanor and credibility." Id. at 547-48. We added:

> To construe the statute otherwise would mean that a child who, as here, is capable of coming to court and testifying would be defenseless against her abuser unless the Division could produce independent corroboration for the child's testimony. That result would be completely at odds with the purpose of Title 9 to protect children from abuse.
>
> [Id. at 548.]

J.C.'s manner of testimony was identical to that in Y.A. She testified in camera, was subject to cross-examination, and the court was able to assess her demeanor. Thus, J.C.'s testimony qualified as in-court testimony and no corroboration was required. In addition, our review of the record reveals nothing suggesting P.F. and J.F. were hindered in their ability to defend against the allegations in the complaint as a result of the manner in which J.C. testified.

25

B.    Sufficiency of Evidence Supporting Findings
      of Abuse and Neglect of J.C.

P.F. and J.F. argue that J.C.'s testimony was insufficient to support the findings of abuse and neglect because her story changed, she provided inconsistent testimony about when and how often the abuse occurred, her credibility was undermined by rebuttal witnesses, she did not suffer from psychological harm, and the court overlooked her motivation to fabricate. D.F. also argues that J.C.'s testimony was not credible, citing to DCPP's findings that some of J.C.'s allegations against P.F. and J.F. were not substantiated.

We have carefully reviewed the record and find no basis on which to disturb the trial court's finding that J.C. credibly testified with respect to the sexual abuse she suffered at the hands of J.F. There is ample evidence in the record supporting the trial court's finding, including corroborating testimony from several people to whom J.C. made contemporaneous disclosures.

In addition, the record supports the trial court's conclusion that P.F. abused and neglected J.C. by not responding appropriately to her child's two disclosures of sexual abuse by J.F. Instead of reporting the abuse so that it could be investigated by the appropriate authorities and separating J.C. from J.F., P.F. told J.C. that she was lying, subjected her to an unreliable polygraph test,

26                                                          A-2006-20

separated her from family, threatened to have her institutionalized, and told family members that she was a liar.

### C. Mroz's Testimony.

P.F. and J.F. argued that the trial court erred by: (1) admitting Mroz's testimony because she did not evaluate J.C. and her testimony constituted a net opinion, and (2) crediting the AHCH evaluation because it relied on insufficient information. D.F. argues that the AHCH's evaluation was an improper net opinion because it found clinical support for physical abuse, whereas DCPP found this allegation unfounded.

When defendants became aware that Phillips was unavailable to testify, they objected to DCPP calling Mroz. The court permitted the parties to conduct voir dire of Mroz regarding how the AHCH evaluation of J.C. was conducted.

Mroz explained that AHCH used a team approach when conducting evaluations. The team included an evaluator, clinical supervisor, and mental health director, who met regularly to review each case. Prior to meeting with the child, the evaluators and the supervisors discussed each client's issues and reviewed the "major questions" for each client. Following the interview, the team assessed the child's emotional and behavioral functioning and developed a family treatment plan.

Phillips reviewed DCPP documents and discussed them with Mroz prior to her first meeting with J.C. Mroz did not interview J.C. or review any DCPP documents prior to issuance of the AHCH report, although she reviewed the documents in preparation for her testimony. Phillips discussed her findings with Mroz, and Mroz concurred with those findings.

The court found Mroz qualified to testify in Phillips's absence. The court found that AHCH used generally accepted psychological testing and that "the team approach has been accepted" in "every court in the state, every venue, certainly at least 100 times in this particular court." The court agreed that Phillips's testimony about J.C.'s demeanor would have been "helpful," but said that Mroz was "an appropriate person to testify" to the team's conclusions, given her involvement in the AHCH evaluation.

We afford trial courts "[c]onsiderable latitude . . . in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016)). Such rulings will only be reversed "when the trial judge's ruling was 'so wide of the mark that a manifest denial of justice resulted.'" N.J. Div. of Youth & Fam. Servs. v.

M.G., 427 N.J. Super. 154, 172 (App. Div. 2012) (quoting State v. Carter, 91 N.J. 86, 106 (1982)).

The admission of expert testimony is generally governed by N.J.R.E. 702, which provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To satisfy this standard, the proponent of the expert evidence must establish that: (1) the subject matter of the testimony is "beyond the ken of the average juror;" (2) the field of inquiry is "at a state of the art such that an expert's testimony could be sufficiently reliable;" and (3) the witness has "sufficient expertise" to offer the testimony. In re Accutane, 234 N.J. 340, 349 (2018) (quoting State v. Kelly, 97 N.J. 178, 223 (1984)).

Expert witnesses may testify about facts or data that inform their analyses and opinions, as long as that information is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject . . . ." N.J.R.E. 703. Moreover, an expert opinion must be based on facts or data derived from either: (1) personal observations; (2) evidence admitted at trial;

and (3) facts or data, whether or not admissible, which are normally relied upon by similar experts in that field. State v. Townsend, 186 N.J. 473, 494 (2006).

In State v. Stevens, 136 N.J. Super. 262, 264 (App. Div. 1975), we found that a police chemist was qualified to testify about his assistant's analysis, stating that "one expert's testimony may be based on the work done or hearsay evidence of another expert, especially if the latter's work is supervised by the former." Similarly, in State v. Dishon, we "reject[ed] the notion that the tests were rendered inadmissible" because the supervisor, and not the assistant who had conducted the tests, testified at trial. 297 N.J. Super. 254, 280 (App. Div. 1997). The court found the supervisor could "rely on facts or data made known to him prior to his testimony if of a type reasonably relied on by experts in forming and rendering opinions upon the subject in question." Id. at 280-81 (citing N.J.R.E. 703). In light of these holdings, and given Mroz's training, experience, and her supervision of this case, the court did not err in permitting her to testify in lieu of Phillips.

Defendants also argue that Mroz offered an inadmissible net opinion. We disagree. "[T]he net opinion doctrine requires experts to 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are [scientifically] reliable.'" In

re Civil Commitment of A.Y., 458 N.J. Super. 147, 170 (App. Div. 2019) (quoting Townsend v. Pierre, 221 N.J. 36, 55 (2015)). Mroz's testimony was based on her experience, supervision of J.C.'s evaluation, and familiarity with the AHCH report, all of which constituted an appropriate foundation for her opinion. Mroz also described the evaluation's methodology and the factual basis for the report's conclusion: the testing, questionnaire, and the clinical interview. Given this foundation, her testimony did not constitute a net opinion.

D.    The Court's Evaluation of the AHCH Report.

Defendants also argue that the court improperly credited DCPP's experts and failed to place proper weight on their expert's criticism of AHCH. D.F. argues that the court failed to consider the inconsistencies between the AHCH evaluation and DCPP's findings.

At the fact-finding hearing, P.F. and J.F. presented a rebuttal expert in psychology, Erik Dranoff, Ph.D, who attacked AHCH's evaluation on several grounds, including because it: (1) failed to consider a specific set of alternative hypotheses and instead accepted J.C.'s allegations as true; (2) was based on insufficient information because P.F. and J.F. had declined to participate in the evaluation; and (3) improperly made conclusions about P.F. and J.F., despite

their not being evaluated. Dranoff relied on various sources in support of his criticisms, including guidelines he admitted were "aspirational."

In making its findings that P.F. and J.F. abused and neglected J.C., the court reviewed the expert testimony and the criticisms offered by their expert. The court found Mroz to be "straightforward" and "credible as an expert." On the other hand, the court found Dranoff's testimony less credible, underscoring that he criticized AHCH for not following certain guidelines, but conceded that these guidelines were merely "aspirational." Further, the court found Dranoff "was not clearly able to say any of the guidelines weren't followed" and that notwithstanding his criticisms, Dranoff conceded that AHCH's testing and interviews were appropriate.

"[T]he weight to be given to the evidence of experts is within the competence of the fact-finder." LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). Because the trial court is the fact-finder, we defer to its "acceptance of the credibility of the expert's testimony and [its] fact-findings based thereon," because it "is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded [his or her] testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999); see also In re Civil Commitment of W.X.C., 407 N.J. Super. 619, 640 (App. Div.

32

2009) (in a civil commitment proceeding, where the appellant refused to be interviewed by the testifying experts, the court reasoned that he could not "now argue that their testimony should not be considered because they did not evaluate him through interviews"). We find no basis on which to disturb the trial court's conclusions with respect to the credibility of the opinions offered by the experts who testified at the fact-finding hearing.

D.F.'s arguments regarding the divergent findings of the AHCH evaluation and the DCPP investigation are unpersuasive. The DCPP investigation and the AHCH evaluation were distinct in their goals and methods. Their differing findings with respect to some of the allegations raised against P.F. and J.F. are immaterial to whether J.C.'s allegations of sexual abuse were established.

E.    P.F.'s Emotional Abuse of J.C.

P.F. and J.F. argue that the trial court's finding that P.F. emotionally abused J.C. and placed her at risk of harm is not supported by the evidence. In addition, they argue that the court erred in excluding testimony about the polygraph examination.

As noted above, the record contains ample evidence establishing P.F.'s emotional abuse of J.C. In addition, the trial court's decision to exclude testimony relating to the results of the polygraph test is supported by law. See

State v. McDavitt, 62 N.J. 36 (1972) (excluding a polygraph exam result as inadmissible to prove that a person is either lying or telling the truth); State v. A.O., 198 N.J. 69, 91-92 (2009) (noting the unreliability of polygraph testing and stating that it is admissible only following a N.J.R.E. 104 hearing establishing its reliability, and only if both parties agree).

    F.    Fifth Amendment.

P.F. and J.F. argue that the court incorrectly drew a negative inference from their refusal to participate in the AHCH evaluation. We disagree.

Throughout the pre-trial conferences, P.F. and J.F. repeatedly stated that they would not participate in the AHCH evaluation, invoking their rights against self-incrimination, given their potential exposure to criminal liability. The trial court repeatedly accepted this explanation, although at one point it noted that their lack of participation would limit information for the evaluator. In its decision, the court referenced P.F.'s and J.F.'s refusal to participate in the evaluations, first when summarizing the witness testimony, and again when listing all of the conduct supporting a finding of abuse against P.F.

"Pursuant to N.J.S.A. 2A:84A–19, and its equivalent, N.J.R.E. 503, every person in New Jersey 'has a right to refuse to disclose in an action . . . any matter that will incriminate him or expose him to penalty . . . .'" E.S. v. H.A., 451 N.J.

Super. 374, 384 (App. Div. 2017). The privilege includes the right "not to answer official questions put to him [or her] in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him [or her] in future criminal proceedings." Allen v. Illinois, 478 U.S. 364, 368 (1986) (quoting Minnesota v. Murphy, 465 U.S. 420, 426 (1984)).

"When a party in a civil matter asserts the privilege against self-incrimination, the fact-finder may draw an adverse inference of guilt." N.J. Div. of Cild Prot. & Permanency v. S.K., 456 N.J. Super. 245, 266 (App. Div. 2018) (citing Attor v. Attor, 384 N.J. Super. 154, 165-66 (App. Div. 2006)). However, such an adverse inference is improper in the context of a Title 9 abuse and neglect fact-finding hearing, when there are related criminal charges pending against the defendants, and the defendant refuses to testify. Id. at 271.

Our review of the record does not support the conclusion that the trial court drew an impermissible adverse inference against P.F. and J.F. While the court noted that they had not participated in the AHCH evaluation, it did not find that the credibility of J.C.'s allegations of abuse were bolstered by an adverse inference based on that lack of participation. In addition, even if we were to conclude that the court drew an impermissible adverse inference, the

error would be harmless, given the overwhelming evidence supporting the trial court's findings that P.F. and J.F. abused and neglected J.C.

To the extent we have not specifically addressed any of P.F.'s, J.F.'s or D.F.'s remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2006-20